FLORAL TRADE COUNCIL OF DAVIS, CALIFORNIA, PLAINTIFF *v.* UNITED STATES, DEFENDANT, AND ASOCIACION COLOMBIANA DE EXPORTADORES DE FLORES, ET AL., DEFENDANT-INTERVENORS

Consolidated Court No. 90–06–00290

■■■■■■

(Dated December 1, 1992)

*Stewart & Stewart* (*Eugene L. Stewart, Terence P. Stewart, James R. Cannon, Jr.* and *Amy S. Dwyer*), for plaintiff.

*Stuart M. Gerson,* Assistant Attorney General, *David M. Cohen,* Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (*Michael S. Kane*); *Patrick Gallagher,* Attorney Advisor, United States Department of Commerce, of counsel, for defendant.

*Akin, Gump, Hauer & Feld, L.L.P.* (*Patrick F.J. Macrory, Spencer S. Griffith* and *Lydia C. Lundstedt*) for defendant-intervenor, Flores Dos Hectareas.

*Arnold & Porter* (*Lawrence A. Schneider, Michael T. Shor* and *Susan G. Lee*) for defendant-intervenors, Asocolflores, et al.

## OPINION

RESTANI, *Judge:* In this action, plaintiff, Floral Trade Council of Davis, California ("FTC") and one of the defendant-intervenors, Flores Condor de Colombia ("Condor"), challenge certain aspects of *Final Results of Redetermination Pursuant to Court Remand, Floral Trade Council of Davis, California v. United States* ("*Final Remand Results*"), issued on May 5, 1992 by the United States Department of Commerce, International Trade Administration ("ITA").

## BACKGROUND

On May 17, 1990, ITA issued the final results of the second antidumping duty review of certain fresh cut flowers from Colombia for the period March 1, 1988 through February 28, 1989. *Certain Fresh Cut Flowers From Colombia,* 55 Fed. Reg. 20,491 (Dep't Comm. 1990) ("*Final Results*"). FTC and defendant-intervenors, Asociacion Colombiana de Exportadores de Flores, its individual members, and 201 individual growers and exporters ("Asocoflores"), challenged the *Final Results* before this court. On September 27, 1991, the court issued a decision remanding the case to ITA. *Floral Trade Council v. United States,* 15 CIT 497, 775 F. Supp. 1492 (1991). The court held, *inter alia,* that ITA erred in rejecting adjustments claimed by Flores Dos Hectareas ("Hectareas") and Flores La Valvanera ("Valvanera") for abnormally low yields due to collapse of a water table and a viral attack. *Id.* at 510, 775 F. Supp. at 1505. The court found that Hectareas and Valvanera provided ITA sufficient information as to the unusual nature of the events and their expected production levels to require ITA to consider the adjustments further. *Id.* In addition, the court held that, in the absence of a specific request for cost data, ITA was not authorized to use best information available ("BIA") as constructed value for companies that did not voluntarily submit cost data, including Universal Flowers ("Universal"),

Flores Bachue ("Bachue"), Dianticola Colombiana ("Dianticola") and Flores Condor ("Condor"). *Id.* at 501–02, 775 F. Supp. at 1498–99. The court remanded to provide Hectareas and Valvanera an opportunity to supplement the record and to permit ITA to collect cost data from Universal, Bachue, Dianticola and Condor. *Id.* at 502 , 775 F. Supp. at 1499.

On remand, in response to ITA's supplemental questionnaire, Hectareas and Valvanera explained why their disasters qualified as "extraordinary" events, as defined under U.S. Generally Accepted Accounting Principles (GAAP). In addition, Hectareas and Valvanera explained how Colombian GAAP would define an extraordinary event. Administrative Record, Public Document ("Pub. Doc.") 29, at 3–4; Pub. Doc. 26, at 2. Universal, Bachue, Dianticola and Condor (and the seven other companies which had not submitted cost data) submitted the requested cost data. In its response to ITA's supplemental questionnaire, Condor amortized preproduction expenses incurred during the period of review for flowers sold thereafter.

On May 5, 1992, ITA issued the *Final Remand Results.* ITA determined that Hectareas and Valvanera established that their expenses resulted from collapse of the water table and severe viral infestation, requiring normalization of these expenses for purposes of the constructed value calculation. *Final Remand Results,* at 21–22. ITA used industry averages as best information available to quantify the normalization adjustment. *Id.* Furthermore, ITA held that the data submitted by Universal, Bachue and Dianticola were accurate. *Id.* at 5–11. In addition, ITA determined that Condor could not amortize its preproduction expenses. *Id.* at 10.

FTC and Condor challenge the *Final Remand Results* before this court. FTC argues that there was insufficient evidence to conclude that the collapse of Hectareas' water table and the viral attack to Valvanera's plants were extraordinary events that called for a normalization adjustment. In addition, FTC argues that ITA erred in using industry averages as best information available to quantify the normalization adjustment for Hectareas and Valvanera. Furthermore, FTC claims that the questionnaire responses submitted by Universal, Bachue and Dianticola were unverified, unexplained and insufficient, and should not be relied upon for purposes of calculating constructed value. Condor argued that ITA erred in rejecting amortization of its pre-production expenses.[1]

## Standard of Review

ITA's decision will be upheld unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(1988). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *N.A.R., S.p.A. v.*

---

[1] The court grants Condor's motion to file a reply and has also considered the government's response to that motion.

*United States,* 14 CIT 409, 412, 741 F.Supp. 936, 939 (1990) (quoting *Gold Star Co. v. United States,* 12 CIT 707, 708–709, 692 F. Supp. 1382, 1383–84 (1988), *aff'd sub nom., Samsung Electronics Co. v. United States,* 873 F.2d 1427 (Fed. Cir. 1989)).

DISCUSSION

I. FTC CHALLENGES

A. *Extraordinary Event:*

The issue is whether Hectareas' and Valvanera's responses to ITA's supplemental questionnaire support the conclusion that the collapse of the water table and the viral attack were extraordinary events.

Colombian GAAP defines "extraordinary" event in a manner similar to U.S. GAAP. To be considered an "extraordinary" event giving rise to extraordinary treatment under U.S. GAAP, the event must be unusual in nature and infrequent in occurrence. An event is "unusual in nature" if it is highly abnormal, and unrelated or incidentally related to the ordinary and typical activities of the entity, in light of the entity's environment. An event is "infrequent in occurrence" if it is not reasonably expected to recur in the foreseeable future. FASB, *Accounting Standards Current Text, General Standards* ("FASB") § 17.107, at 24,468–69; Appendix 1 to Floral Trade's Memorandum in Opposition to Remand Results.

(1) Hectareas.

The evidence contained in Hectareas' response to ITA's supplemental questionnaire substantially supports the conclusion that the collapse of the water table was an extraordinary event. Prior to building, geological studies had been prepared to assess the appropriate location, depth and capacity of the well. Pub. Doc. 29, at 2–3. During the first five months after planting, the well functioned normally, and was proven to have capacity for twelve hectares of flower production. *Id.* at 9. In the sixth month, however, the well produced barely enough water to irrigate two hectares of the farm. *Id.* at 2. Hectareas stated that: "The failure of the well was not due to a mechanical problem, equipment failure or unusual weather conditions. The well failed, instead, because the water table supplying water to the well suddenly and unexpectedly collapsed." *Id.* Due to the lack of water resulting from the collapse, plants began to die, and the flowers were smaller than normal and had weak stems. *Id.* at 9. Many flowers, which would otherwise have been available for export, were sold in the home market instead. *Id.* at 10. Therefore, there is sufficient evidence to conclude that the collapse of the water table was highly abnormal. Furthermore, the record establishes that the collapse of the water table is not related to Hectareas' business, in the sense that it was not caused by flower production. Accordingly, the water table collapse may be viewed as "unusual."

During the history of Agrodex, the group of twenty-two farms to which Hectareas belonged at the time of the review, a water table had

never collapsed. *Id.* at 3, 12. Therefore, the conclusion that the collapse of the water table was an event which was infrequent in occurrence was also substantially supported.

(2) Valvanera.

The evidence contained in Valvanera's response to ITA's supplemental questionnaire likewise substantially supported the conclusion that the virus attack was an extraordinary event. The virus that attacked Valvanera's pompon plants during the period of review was unknown in Colombia, and its attack was completely unexpected. Pub. Doc. 26, at 1. Valvanera was required to send samples of the diseased flowers to the United States for analysis, as they could not be analyzed in Colombia. *Id.* Although certain types of viruses are considered normal, the virus at issue is not common for pompons in Colombia and the virus caused an extremely adverse impact on production. *Id.* at 8–9. It was not error to conclude that the virus was unusual.

Furthermore, the record demonstrates that due to the steps taken by ·Valvanera to prevent recurrence of the virus, it is unlikely that a virus of this severity, with its significant loss in production, will occur in the future. *Id.* at 9–10. Therefore, the conclusion that the virus at issue was an event infrequent in occurrence also is substantially supported.

(3) Financial Statements.

FTC argues that ITA erred in classifying the expenses as "extraordinary," because Hectareas and Valvanera did not treat them as such in their financial statements.

It has been ITA's practice to base its treatment of certain expenses on the treatment respondents accord those items in their financial statements, if they are consistent with GAAP and do not distort costs. *See, e.g., Titanium Sponge From Japan,* 57 Fed. Reg. 557, 561–62 (Dep't Comm. Jan. 7, 1992) (final results); *Oil Country Tubular Goods From Canada,* 51 Fed. Reg. 15,029, 15,031 (Dep't Comm. 1986) (final determination of sales at less than fair value).

Hectareas' and Valvanera's financial statements did not mention the collapse of the water table and the viral attack as extraordinary events; therefore, they were not consistent with U.S. and Colombian GAAP, as ITA found. *Final Remand Results,* at 21–23. Blind adherence to the accounting methods chosen by respondents would not yield a result properly reflective of costs. ITA is allowed to prefer substance over form. ITA's determination on this point was adequately supported and will be sustained.

B. *Use of Industry Averages As Best Information Available:*

The issue is whether substantial evidence supports ITA's use of industry averages as BIA. ITA may use BIA whenever a party "refuses or is unable to produce information requested in a timely manner and in the form required." 19 U.S.C. § 1677e(c)(1988); *see also* 19 C.F.R. § 353.37(a) (1992). ITA has broad discretion in selecting BIA. *See*

*N.A.R., S.p.A.,* 14 CIT at 416, 741 F. Supp. at 942; *Timken Co. v. United States,* 11 CIT 786, 789, 673 F. Supp. 495, 501 (1987).

ITA used industry averages as BIA to quantify the normalization adjustment because actual historical data was not available for Hectareas and Valvanera. *Final Remand Results,* at 21–22. Hectareas had no data available because the crop at issue was its first. *See* Pub. Doc. 29, at 9. Valvanera had not maintained records relating to its two years of pompon production prior to the viral infestation. Pub. Doc. 26, at 8. Hectareas and Valvanera provided production data based upon the actual historical experience of other producers in the Agrodex group. Pub. Doc. 29, at 4–5; Pub. Doc. 26, at 8. This data reflects the experience of other farms in the same geographical area, subject to the same environmental factors, operating under common managerial, technical, and marketing guidelines. ITA's choice of BIA rates from similarly situated farms is substantially supported and is sustained.

C. *Cost Data Submitted by Universal, Bachue, and Dianticola:*

FTC argues that the questionnaire responses submitted by Universal, Bachue and Dianticola were "unverified, unexplained and insufficient," and should not be relied upon for purposes of calculating constructed value. According to FTC, ITA should have investigated further or conducted verification procedures, or both.

In conducting a review and making a determination under § 1675(a) of Title 19, as opposed to an initial investigation, verification is required if it is timely requested and no verification has occurred for two consecutive reviews. 19 U.S.C. § 1677e(b)(3) (1988). The last requirement is waivable for cause. *Id.; see also Industrial Quimica Del Nalon, S.A. v. United States,* 14 CIT 143, 145, 732 F. Supp. 1180, 1182 (1990), *interlocutory appeal denied,* 904 F.2d 44 (Fed. Cir. 1990) (table) (ITA is required to verify all information relied upon, if: verification is timely requested; no verification has taken place for two consecutive reviews; and there is a minimal indication of changed circumstances justifying verification).

Apparently, FTC believes the verification is required based on cause. ITA analyzed the information included in the responses of Universal, Bachue and Dianticola, determined that the information was adequate to calculate constructed value, and found no record evidence to support rejection of these responses. *Final Remand Results,* at 6, 9 and 11. FTC produced no evidence to support its claim and its assertions amount to mere speculation. As there was no evidence that respondents' submissions were inaccurate or incomplete, ITA properly accepted the constructed value data submitted by Universal, Dianticola and Bachue without verification.

## II

### CONDOR'S CHALLENGES

ITA rejected Condor's amortization of pre-production expenses incurred during the period of review for flowers sold thereafter. ITA stated

that its "standard methodology at the time of the second administrative review did not allow for the amortization of pre-production costs incurred before the period under review." *Final Remand Results,* at 10.[2] Condor argues that ITA did not employ this "standard" methodology during the second review. The government agrees with Condor, to the extent that there was no general policy of declining to amortize pre-production costs. The basic methodology employed in the original investigation and the second review, which is at issue, however, was to expense such costs incurred during the period of review. Presumably that is how the costs were treated on the books of most of the respondents. Condor cites four examples of amortization, out of fifty. The government explained that pre-production costs of those respondents were amortized in the ordinary course of business of such respondents and were so reflected in their business records.[3] Thus, the amortization was accepted. In view of Condor's own records which did not reflect amortization and lack of data on atypical production, Condor cannot support a request for amortization.

### CONCLUSION

ITA' decision to normalize extraordinary costs related to Hectareas' collapse of the water table and Valvanera's virus attack is supported by substantial evidence. The record further indicates that ITA appropriately accepted the constructed value data submitted by Universal, Bachue and Dianticola. Based on the methodology employed and implicitly approved in the original and second reviews and the information submitted by Condor, ITA was not required to amortize Condor's preproduction costs.

ITA's remand determination is sustained *in toto.*

---

[2] This statement is ambiguous. It may mean the *pre-period* expenses were not amortized because the expenses were expected to recur in the current period. In such a case, amortization would be unnecessary. If the costs are stable and consistently expensed or consistently amortized on company books, no distortion should occur. If a company changes its methods, it may create a temporary distortion.

[3] Apparently, there were some minor costs which ITA allowed to be amortized even though they were expensed in business records. ITA apparently did not want to conduct a verification to segregate these expenses. There may have been an error, but as FTC did not complain about this particular item, ITA need not undertake the verification. In any case, this does not entitle *Condor* to the adjustment.